**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nicholas Woodall, | No. CV-21-00962-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Phoenix Police Department, et al., | |
| Defendants. | |

Pending before the Court are: (1) Defendants' Motion for Summary Judgment (Doc. 221); (2) Defendants' Motion to Dismiss Case (Doc. 263), and (3) Plaintiff's Motion for Leave to File for Termination Sanctions (Doc. 290). For the reasons stated below Defendants' Motion for Summary Judgment (Doc. 221) is granted in part and denied in part. Defendant's Motion to Dismiss (Doc. 263) is denied and Plaintiff's Motion for Leave to File Termination Sanctions (Doc. 290) is also denied.

## BACKGROUND

On Friday October 30, 2020, at approximately 5:18 PM, the City of Phoenix (the "City") Police Department received a 9-1-1 call. The caller expressed concern because a man with his face covered by a ski mask was going through the contents of a plastic trash bag outside the FBI Building.[1]

---

[1] Plaintiff asserts that the 9-1-1 caller did not identify the building as the FBI building but nevertheless acknowledges that he was engaged in protest on the sidewalk outside the visitor drive entrance by the west side of the FBI building and apparently that he did have a plastic trash bag with him. (Doc. 265 at 5, 13).

Officers Richard Sias and Kody King (the "Officer Defendants") responded to the call, arriving approximately twenty minutes later.  Both wore body cameras, which produced recordings[2] that were provided to the Court for consideration on summary judgment.  *See Scott v. Harris,* 550 U.S. 372, 380–81 (2007) (holding that a court may properly consider video evidence in ruling on a motion for summary judgment and should view the facts "in the light depicted by the videotape"); *Blankenhorn v. City of Orange,* 485 F.3d 463, 468 n.1 (9th Cir. 2007).

When the Officer Defendants first saw Plaintiff from inside their vehicle, they said:

> King:  Oh.  This guy.
> Sias:   Apparently.  What's he doing.
> King:  Oh my God!  Standing there with a sign.
> Sias:   I know.
> King:  Standing on the public sidewalk.  Probably I
>           don't know protest maybe.
> Sias:   Watch. Just watch.

(Ex. F at 01:01–:16; Ex. G at 01:00–:13).

Plaintiff was alone outside the FBI building, holding up a protest sign and wearing "a mask and shades" to protect his identity.  He was on the sidewalk, which runs north-to-south along the street to the west side of the FBI property.  The sidewalk abuts desert landscaping that separates it from the circular drive and gate in front of the FBI building. The building itself is further set back from the road to the northeast.  Plaintiff stood near the street, north of the driveway entrance to the circular drive but was not close to the building or the gate.

While Plaintiff was standing on the public sidewalk, most of his plastic bag sat on the unpaved area between the west edge of the paved sidewalk—furthest from FBI property—and the curb.  (Ex. F at 01:27–:31).  Officer Sias was the first to engage with Plaintiff, getting out of the officers' vehicle and asking Plaintiff what he was doing.  (*Id.* at 01:22–:33).  The exchange between the two was civil in its entirety.  Plaintiff responded

---

[2] The recordings were filed non-electronically (Doc. 240) in support of Defendants' Motion for Summary Judgment, and labelled as Exhibit F—the footage from Officer Sias's body worn camera—and Exhibit G—the footage from Officer King's body worn camera.  The recordings will be cited as "(Ex. F)" and "(Ex. G)" with timestamps marking the play time of each video.

that he was protesting peacefully (*id.* at 01:33–:35) to which Officer Sias replied "excellent" and asked what Plaintiff's sign said. (*Id.* at 01:35–:38). Plaintiff, who had set the sign down so that his message could not be seen, indicated that he did not "think it matter[ed]" what the sign said and further responded that it was "no problem" because it was a message to only the FBI. (*Id.* at 01:29–:47).

At this point, Officer Sias told Plaintiff that the officers were "going to have to document who" they were talking to. (*Id.* at 01:49–:52). In response, Plaintiff asked if he was doing anything illegal because he had talked to "a guy in there"—gesturing to the FBI building—and had been told the sidewalk was public. (*Id.* at 01:58–02:06). Officer Sias indicated that the sidewalk was public but that the area between the paved sidewalk and the curb where his plastic bag was sitting was the FBI's private property. (*Id.* at 02:06–:13). Plaintiff then apologized "immensely" and moved his bag completely onto the sidewalk. (*Id.* at 02:14–:18).

Officer Sias then asked if Plaintiff had ID. (*Id.* at 02:20). Plaintiff replied that he would rather leave than provide his ID. (*Id.* at 02:20–:22). Officer Sias replied: "We're going to need to get your ID. It's no problem. We just have to document who we're talking to." (*Id.* at 02:23–:27). When Plaintiff responded that he did not think he had an ID on him, Officer Sias asked him for his name and date of birth. (*Id.* at 02:28–:32). Plaintiff said he did not want to provide that information unless Officer Sias could specifically prove to him that there was a problem that would justify taking this information. (*Id.* at 02:33–:42). Officer Sias responded: "You were on their property so they want you trespassed. So we're going to have to trespass you from their property." (*Id.* at 02:42–:48).

Officer Sias again assured Plaintiff that the small parkway area between the sidewalk and the curb was not public property. (*Id.* at 02:48–03:14). When Plaintiff asked if the placement of the plastic bag on the small area between the sidewalk and the curb would be considered insignificant, Office Sias replied "[n]o, not really" because "nothing's insignificant; people call us for a reason." (*Id.* at 03:13–:30). When Plaintiff began to

suggest that the officers did not need to trespass him and create an issue (*id.* at 3:30–:50), Officer Sias interrupted and said

> It doesn't need to be an issue. I still just gotta tell you and document it so you can't come back on their property. Nothing says that you can't come on the sidewalk because you're more than welcome to come on the sidewalk. But I do have to document that you were on their property and they don't want you on the property anymore.

(*Id.* at 03:48–04:04). As other officers began to arrive at the scene, Officer King told them that Plaintiff was "protesting the FBI" and that Officer Sias was trying to get identification from Plaintiff. (Ex. G at 04:22–:33).

After a minute or so of additional discussion between Officer Sias and Plaintiff on documenting Plaintiff's identity, Plaintiff asked if there was an issue of probable cause when he was not informed that the area was FBI property and expressed concern that Officer Sias was now taking his information for "something like protesting." (Ex. F at 04:48–05:03). Officer Sias responded, "I am not taking your information for protesting though" to which Plaintiff replied, "you're taking my information for trespass." (*Id.* at 05:03–:08). Officer Sias repeated "[y]ou're more than welcome to stand here and protest, more than welcome," but told Plaintiff that he was not free to have his plastic bag in the unpaved area between the sidewalk and the curb. (*Id.* at 05:06–:23). After a little additional discussion, Officer Sias then said

> We're not taking any action on it. I just have to document that you've been told that you are not allowed on FBI property anymore. That's it. That's all. That's it. You're not going to jail. Nothing's happening but I have to document for my own job okay.

(*Id.* at 05:25–:40).

After confirming that the discussion was being recorded Officer Sias said

> I'm not telling you that you cannot be here protesting. That's not what I'm saying at all. Ok? All that I'm saying is that you have to give me your information so that I can document that I have told you . . . you're not allowed to be on their property. That's what I'm telling you. Nothing says that we're gonna all leave and you could stay right here if you'd like and do your thing.

- 4 -

(*Id.* at 05:45–06:19)

Thereafter they spent several minutes discussing whether the property between the sidewalk and the curb was FBI property or public property, whether Plaintiff could have or should have known as much, and whether it was an abuse of power to require Plaintiff to surrender his personal information for placing his bag in the area between the paved sidewalk and the curb while he was protesting on the sidewalk. (*Id.* at 06:20–07:45). During the conversation, Officer Sias repeated to Plaintiff that the property between the curb and the paved sidewalk was FBI property pursuant to the Arizona Revised Statutes and that the FBI wanted him trespassed for putting his bag there. (*Id.*).

Eventually, Officer Sias said to Plaintiff: "give me a minute, give me a minute okay," before instructing Officer King to speak with Plaintiff. (*Id.* at 07:44–:48; Ex. G at 07:43–:46). Officer Sias then walked over toward his supervisors who had come to the scene, turning off the audio portion of his recording. (Ex. F at 07:46–:57). Officer Sias's audio remained silenced for approximately the next fifteen minutes. (*Id.* at 21:41).

After Officer Sias left to speak to his supervisors, Officer King asked Plaintiff whether Plaintiff had only been standing on the sidewalk or if he had walked onto FBI property. (Ex. G at 08:04–:14). Plaintiff confirmed that he had only been standing on the sidewalk. (*Id.* at 08:08–:14). Plaintiff and Officer King continued to have a courteous conversation, during which Officer King told Plaintiff that they would have to confirm with the FBI whether the area between the sidewalk and the curb was private property because there was no signage. (*Id.* at 09:32–:42, 10:19–:32). When Plaintiff stated that he should not be "burden[ed]" by having his "personal information . . . taken" just because of his presence on the sidewalk, Officer King said that Plaintiff was "correct." (*Id.* at 10:32–:42).

Plaintiff then asked if the other officers would have to find "some kind of a blueprint from the City" to determine whether the area between the sidewalk and the curb was public property, to which Officer King responded: "I don't think it's that big of a deal, man." (*Id.* at 10:45–:54). Officer King pointed at the area between the sidewalk and the curb, telling Plaintiff that in his opinion, the "whole strip" of property between the sidewalk and the

curb "belongs to the City of Phoenix." (*Id.* at 10:56–11:08). Plaintiff replied: "If this whole strip belongs to the City of Phoenix then I wasn't trespassing and there would be no reason to take my information, correct?" (*Id.* at 11:08–:14). Officer King answered: "that's what it's lookin[g] like to me" (*id.* at 11:14–:16), and later, repeated his opinion that neither the sidewalk nor the strip of property between the sidewalk and the curb belonged to the FBI (*id.* at 12:48–13:10).

When Officer Sias turned back on the audio of his body camera, one of his supervisors, Sergeant Blalock, told Plaintiff that he must let pedestrians by on the sidewalk. (Ex. F at 21:43–:48). Plaintiff said that he would and then asked Sergeant Blalock where he should stand if he needed to let someone by. (*Id.* at 21:48–:58). Sergeant Blalock responded: "I would step to your right," indicating that Plaintiff should step off the sidewalk and into the area between the sidewalk and the curb. (*Id.* at 21:57–22:03). The officers then left without bringing any charges against Plaintiff. (*Id.* at 22:08–:10).

Mr. Woodall now brings a 42 U.S.C. § 1983 cause of action against the Officer Defendants for retaliation for the exercise of his First Amendment rights (the "First Amendment Retaliation Claim") and for wrongful detention under the Fourth Amendment (the "Wrongful Detention Claim"). He also brings a *Monell* action against the City for failure to train and appropriately supervise its officers (the "*Monell* Claims").

## DISCUSSION

**I.    Defendants Are Not Entitled to Qualified Immunity for Plaintiff's First Amendment Retaliation Claim but Are Entitled to Qualified Immunity on his Wrongful Detention Claim.**

### A.    Legal Standard

Police officers are qualifiedly immune from paying damage § 1983 claims to the extent that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At summary judgment, an officer may be denied qualified immunity only if the plaintiff demonstrates that (1) the officer "violated a federal statutory or constitutional

right, and (2) the unlawfulness of [the officer's] conduct was 'clearly established at the time'" of the violation. *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

In qualified immunity cases,"[t]he plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (citation modified) (quoting *Sharp v. County of Orange*, 871 F.3d 901, 909 (9th Cir. 2017)); *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (plaintiff has burden of proof to demonstrate that the right was clearly established); *see also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (citation omitted) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."). A defendant asserting qualified immunity bears "no analogous burden . . . to find factually on-point cases clearly establishing the lawfulness of an officer's actions" or to "come forward with precedent showing that the unlawfulness of their conduct was not clearly established." *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023).

### B. Plaintiff's First Amendment Retaliation Claim Survives Summary Judgment.

Plaintiff's allegations that the Defendants engaged in retaliatory conduct in detaining Plaintiff for approximately twenty minutes and demanding his identification when he was engaged in lawful protest outside the FBI building are sufficient to survive summary judgment. Plaintiff has satisfied his burden of identifying a "clearly established" right and that a reasonable juror could find that the Officer Defendants violated that right. *Wesby*, 583 U.S. at 62-63.

### 1. The Right to Be Free from First Amendment Retaliation Was Clearly Established at the Time of the Events Here.

A year and a half prior to the events in this case, the United States Supreme Court decided *Nieves v. Bartlett*. 587 U.S. 391 (2019). In its opinion, the Supreme Court held

that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Id.* at 398.

To succeed in a First Amendment retaliation action against a police officer who detains or arrests a plaintiff who was involved in expressive activity based on a retaliatory "forbidden motive," the plaintiff must establish either (1) that the officer did not have justifiable reason to arrest or detain him or (2) that the plaintiff had been detained when otherwise similarly situated individuals not involved in First Amendment activity had not been detained. *Id.* at 398–99, 406–08 (citing other sources).

In most cases, which fall under the first category of cases identified in *Nieves*, the plaintiff has the burden of establishing a lack of probable cause for an officer's retaliatory action before the plaintiff can bring a claim for retaliation. *Id.* at 401–02. The second category reflects a significant, though narrow, exception to this general rule. *Id.* at 406–07. A plaintiff does not have to prove a lack of probable cause if he instead "presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected [conduct] had not been." *Id.*

> For example, at many intersections, jaywalking is endemic but rarely results in arrest. If an individual who has been vocally complaining about police misconduct is arrested for jaywalking at such an intersection, it would seem insufficiently protective of First Amendment rights to dismiss the individual's retaliatory arrest claim on the ground that there was undoubted probable cause for the arrest.

*Id.*

*Nieves* clearly establishes the extent of Plaintiff's right to be free from retaliation for his exercise of expressive activity. He has such a right either when non-retaliatory grounds are insufficient to provoke the officer's action (i.e., when the officers lack probable cause), or when the officer has not taken the same adverse action against similarly situated individuals not engaged in First Amendment activity despite the existence of probable cause to do so. Plaintiff has overcome the qualified immunity hurdle in each case.

### a.    Defendants Had No Probable Cause to Detain Plaintiff.

Rather than arguing that Plaintiff's plastic bag on the sidewalk constituted probable cause for trespass,[3] Defendants merely claim that the Officer Defendants are entitled to qualified immunity because they had probable cause to arrest Plaintiff for not providing his true full name to Officer Sias under A.R.S. § 13-2412(A).

Under Arizona state law, if Defendants had reasonable suspicion to conduct a *Terry* stop on Plaintiff, and Plaintiff refused to provide his true full name to the officers, the officers would have probable cause to arrest Plaintiff for his failure to provide his true full name, but only if he continued to refuse to provide it after they had advised him that doing so under the circumstances was unlawful. *Id.* The state law at issue specifies that:

> It is unlawful for a person, after being advised that the person's refusal to answer is unlawful, to fail or refuse to state the person's true full name on request of a peace officer who has lawfully detained the person based on reasonable suspicion that the person has committed, is committing or is about to commit a crime.

*Id.* Defendants' insistence that Plaintiff's conduct violated this statute—to the exclusion of all other bases for probable cause—is fatal to their argument. Even assuming the Officer Defendants had reasonable suspicion that Plaintiff was involved in criminal activity, their failure to advise him that his refusal to answer was unlawful eliminates any reasonable basis for probable cause.

It is only unlawful for a person "to fail or refuse" to provide their true full name until they have been "advised that [their] refusal to answer is unlawful." *Id.* That never happened here. As described above, within a short time of encountering Plaintiff, Officer Sias told Plaintiff that the officers had "to document who [they] talk to." When Plaintiff asked why the officers needed his information and whether he was doing anything illegal, Officer Sias responded that Plaintiff's "stuff[] [was] on the property of the FBI." (Ex. F at 01:49–02:02). But, again, Defendants have not asserted qualified immunity against

---

[3] Arizona statutes seem to suggest that any unpaved area between the paved sidewalk and the curb are also public sidewalk. "'Sidewalk' means that portion of a street that is between the curb lines or the lateral lines of a roadway and the adjacent property lines and this is for the use of pedestrians." A.R.S. § 28-601(24).

Plaintiff's First Amendment Retaliation Claim on the basis that they had probable cause for trespass.  Plaintiff repeatedly asked why he needed to provide his ID to the officers and Officer Sias repeatedly insisted that the ID was necessary for the purposes of documentation and because the FBI wanted him trespassed.  (*Id.* at 01:49–02:02, 02:17–:47, 03:47–04:04, 04:45–:53; 05:00–:03, 05:21–:23).  Plaintiff also repeatedly suggested that it was abusive and extreme to demand his identifying information, and that doing so was unnecessary under the circumstances; Officer Sias again responded that it was necessary because the information needed to be documented. (*Id.* at 04:45–:53, 06:05–:15, 06:25–:31).

At no point did the Officer Defendants advise Plaintiff that the refusal to provide his full true name would be unlawful under the circumstances. The police therefore had no probable cause to arrest Plaintiff for violating A.R.S. § 13-2412(A) because the statute explicitly provides that his conduct cannot be considered criminal without that prerequisite advice.   Because Plaintiff has shown that the record does not provide a reasonable basis for probable cause to support Defendant's only purported non-retaliatory justification, he has overcome the qualified immunity hurdle.  In other words, Plaintiff has demonstrated a clearly established right to be free from retaliation for expressive activities and that Defendants' purported basis for probable cause was unreasonable under the circumstances.

**b.    Defendants Had No Reasonable Suspicion to Detain Plaintiff**

Here, Defendant's lacked reasonable suspicion to stop Plaintiff.[4] To justify a *Terry* stop the officer "must be able to articulate more than an 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity. . . .  Rather, reasonable suspicion exists when an

---

[4] Plaintiff was detained for approximately eighteen minutes.  Certainly, Defendants had the right to begin a consensual conversation with Plaintiff.  *United States v. Brown,* 996 F.3d 998, 1005 (2021) (citing *Florida v. Bostick*, 502 U.S. 429, 434 (1991)).  "So long as a reasonable person would feel free to disregard the police and go about his business the encounter is consensual and no reasonable suspicion is required." *Id.* (quoting *Bostick*, 502 U.S. at 434 (citation modified)). But almost immediately after the encounter between Plaintiff and Officer Sias began, Officer Sias told Plaintiff he had to provide ID.  At this point, Defendant was not free to go, nor was he free to go until approximately eighteen minutes later when Sergeant Blalock spoke with him.

officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo* 208 F.3d 1122, 1129 (9th Cir. 2000) (citations omitted) (emphasis in original). "The requirement of *particularized* suspicion encompasses two elements. . . . First, the assessment must be based upon the totality of the circumstances. . . . Second, that assessment must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *Id.* (citations omitted) (emphasis in original).

The Defendant Officers cannot demonstrate that they had reasonable suspicion to justify their *Terry* stop of Plaintiff. When the officers first saw Plaintiff, they observed that he was engaged in a protest on a public sidewalk. Plaintiff was in the vicinity of no one. He was close to no building. He had not attempted to contact anyone driving onto FBI property or using its circular drive; indeed, only the police used the drive during the officers' encounter with Plaintiff. Under these circumstances, neither Plaintiff's ski mask nor his sunglass nor the riots and unrest that occurred throughout the country six months earlier after the death of George Floyd can provide a basis for particularized suspicion that Plaintiff had engaged, was engaging, or was about to engage in any crime. Without particularized suspicion, there can be no reasonable suspicion to justify the stop.

### c. Plaintiff Raises Issues of Fact as to Whether Police Normally Detain People Not Engaged in Expressive Activity for Trespassing When They Encroach on the Area Between a Paved Sidewalk and a Curb.

Further, Plaintiff has successfully raised issues of fact as to whether Defendants normally detain people who are similarly situated to Plaintiff and who are not engaged in expressive activity such that he is entitled to pursue his claim. Even where probable cause does exist, a plaintiff's claim is not defeated where the plaintiff can produce "objective evidence that he was [treated adversely] when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 587 U.S. at 407; *see also Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (holding that, in the context of First

Amendment retaliation claims under *Nieves*, "the demand for virtually identical and identifiable comparators goes too far.").

Though Officer Sias repeatedly asserted that Plaintiff had trespassed by placing his bag between the paved sidewalk and the curb, as described above, Officer King told Plaintiff during the same encounter that he did not believe the property between the sidewalk and the curb was private and that Plaintiff was not trespassing because it belonged to the City. (Ex. G at 10:56–11:16). Indeed, when the officers first saw Plaintiff from their vehicle, Officer King noted to Officer Sias that Plaintiff was "standing on the public sidewalk" and that he appeared to be protesting. (Ex. F. at 01:06–:08). These facts are sufficient to raise an issue as to whether Defendants normally detain people similarly situated who are not engaged in expressive conduct. The Officer Defendants' conflicting statements provide some evidence of the alleged "causal connection between animus and injury." *Nieves*, 587 U.S. at 407.

### 2. Plaintiff Has Raised Issues of Fact as to Defendant's Motive for Detaining Him.

Without probable cause and with genuine issues of material fact as to whether similarly situated individuals who are not engaging in expressive activity are detained, the Defendants may have acted with a forbidden, retaliatory motive when detaining Plaintiff. *Id.* at 402 (holding that while the absence of probable cause will "generally provide weighty evidence that the officer's animus caused the arrest). Despite Defendants' stated assurance to Plaintiff that he was free to protest, the circumstances of his detention at least raise an issue of fact regarding their motives.

Moreover, the Officer Defendants' comments when they first saw Plaintiff provide further evidence upon which a jury could find that they acted with animus towards Plaintiff because of their distaste for his protest in front of the FBI building:

> King: Oh. This guy.
> Sias: Apparently. What's he doing.
> King: Oh my God! Standing there with a sign.
> Sias: I know.
> King: Standing on the public sidewalk. Probably I
> don't know protest maybe.

- 12 -

Sias:   Watch. Just watch.

(Ex. F at 01:02–:16; Ex. G at 01:00–:13).  These comments, and Officer King's later comments that were described above, further support Plaintiff's challenge to the accuracy of Officer Sias's repeated statement that the FBI wanted him cited for trespass, when he was lawfully engaged in protest activity on public property.  (Doc. 265 at 7, 9–10).

Though Defendants do not assert reasonable suspicion or probable cause for trespassing as a basis for qualified immunity against Plaintiff's First Amendment Retaliation Claim, the Officer Defendants' lack of reasonable suspicion to stop Plaintiff in the first place is relevant, though not dispositive, to the "forbidden motive" element of this claim.  *See Nieves*, 587 U.S. at 402.

In sum, Plaintiff sufficiently alleged his First Amendment Retaliation Claim to survive both the qualified immunity arguments asserted by Defendants and the summary judgment standards.  Defendants' Motion for Summary Judgment is denied as to this claim.

## C.   Defendants are Entitled to Qualified Immunity on Plaintiff's Wrongful Detention Claim.

Plaintiff has overcome the hurdle of qualified immunity on his First Amendment Retaliation Claim but fails to do so on his Wrongful Detention Claim because he does not identify any "clearly established" right.  A plaintiff seeking damages for a violation of his Fourth Amendment rights faces the question of whether an officer *had* to know under the circumstances that they did not have any probable cause.  Thus, the Fourth Amendment plaintiff bears an especially high burden to overcome qualified immunity.

Indeed, beyond the general requirements of identifying a clearly established right, a Fourth Amendment plaintiff must establish existing precedent to "place[] the statutory or constitutional question beyond debate."  *Waid v. County of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  The Supreme Court has held "[s]uch specificity" is required because "it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."  *Id.* (internal quotation marks and citations omitted).  "Cases cast at a high level

of generality are unlikely to establish rights with the requisite specificity." *Id.* at 388 (internal quotation marks and omitted). "While a case addressing general principles may clearly establish a right in an obvious case, such obvious cases are rare." *Id.* (citations and quotation marks omitted). "Plaintiff[] must either explain why [his] case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations." *Id.* (citing *Hopson*, 71 F.4th at 697).

Here, though Plaintiff has shown that he was detained,[5] his citations to generalized Fourth Amendment rules governing such detentions are insufficient to survive summary judgment on the Wrongful Detention claim because they do not identify a "clearly established" right. While Defendants' arguments that the officers had reasonable suspicion fail as discussed above, Plaintiff has not pointed to prior case law which makes it clear that, under the circumstances, Officers Sias and King *had* to know that they had no basis to detain Plaintiff when they did. In other words, the cases Plaintiff cites are at too high a level of generality to hold that Defendants *had to have known* that, when they saw Plaintiff completely masked and close to an FBI building at night, they had no reasonable suspicion to conduct a *Terry* stop. In the Fourth Amendment context, he is obliged to cite factually analogous cases with specificity to identify a clearly established right that places the question of whether the officer's conduct was unlawful under the particular circumstances beyond debate. *Waid*, 87 F.4th at 387–88. He has not done so. Thus, Defendants are entitled to qualified immunity on Plaintiff's Wrongful Detention Claim.

---

[5] Plaintiff was detained for approximately eighteen minutes. Certainly, Defendants had the right to begin a consensual conversation with Plaintiff. *United States v. Brown,* 996 F.3d 998, 1005 (2021) (citing *Florida v. Bostick*, 502 U.S. 429, 434 (1991)). "So long as a reasonable person would feel free to disregard the police and go about his business the encounter is consensual and no reasonable suspicion is required." *Id.* (quoting *Bostick*, 502 U.S. at 434 (citation modified)). But almost immediately after the encounter between Plaintiff and Officer Sias began, Officer Sias told Plaintiff he had to provide ID. At this point, Defendant was not free to go, nor was he free to go until approximately eighteen minutes later when Sergeant Blalock spoke with him.

## II. Defendants Are Also Entitled to Summary Judgment on Plaintiff's *Monell* Claims.

Plaintiff brings *Monell* claims against the City for its failure to train its officers and a failure to adequately supervise them.

To bring a failure to train claim, Plaintiff must show the City's deliberate indifference in failing to provide such training. *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). To establish such a claim, Plaintiff is obliged to "present evidence of prior incidents of the same character that would have made City officials aware of the situation such that the City could reasonably be said to have been deliberately indifferent to the need for further training." *Mueller v. Auker,* 700 F.3d 1180, 1194 (9th Cir. 2012) (citation modified) (quoting *Merrit v. County of Los Angeles*, 875 F.2d 765, 771 n.10 (9th Cir. 1989)). In the alternative, Plaintiff might establish that "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent." *City of Canton,* 489 U.S. at 390.

Yet Plaintiff does not challenge the City's assertion that its training program includes constitutional law relating to detentions and freedom of expression. (Doc. 222 at ¶ 37). Though he alleges that certain materials have been destroyed, he does not do so in a sufficient manner to create a material issue of fact. Nor does Plaintiff provide any facts on which a reasonable jury could find that, at the time of his detention, (a) the City was aware that its officers were detaining persons similarly situated to Plaintiff, or (b) the law clearly prohibited the detention of persons who were similarly situated to him. Moreover, he fails to establish what training he deems to be necessary such that failure to provide it was "so likely to result in [a] violation of constitutional rights, that the" City can be deemed to have been deliberately indifferent in failing to provide it. *City of Canton,* 489 U.S. at 390.

Plaintiff also fails to identify any facts in the record which would suggest that the City detained other persons engaged in expressive activity without probable cause, reasonable suspicion, or for laws which they generally did not enforce.  In general, a single incident, in this case the one involving Plaintiff, does not support a failure-to-train theory. *Benavidez v. County of San Diego*, 993 F.3d 1134, 1154 (9th Cir. 2021); *see also Connick v. Thompson*, 563 U.S. 51, 62 (2011) ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997))).  "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Connick*, 563 U.S. at 62.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.* at 61.

For similar reasons, Plaintiff's failure to supervise theory fails.  *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989) ("*Canton* dealt specifically with inadequate training. We see no principled reason to apply a different standard to inadequate supervision.").  To bring a failure to supervise claim, Plaintiff must show the City's deliberate indifference in failing to adequately supervise its officers.  *Id.*  Plaintiff does not identify what the supervisors on the scene failed to do in a way that demonstrates their deliberate indifference.  Nor does he demonstrate that the law clearly prohibited the Officer Defendants' detention of Plaintiff in this case at the time that the officer's engaged in it.  Nor does Plaintiff's argument that Defendants failed to adequately and accurately report the incident establish that the supervisory Defendants were deliberately indifferent in their actions toward Plaintiff at the scene in a way that caused him damage.  Accordingly, summary judgment is granted to the City on Plaintiff's failure to supervise claim.

### III.    The Defendants' Motion to Dismiss is Denied.

Plaintiff has often failed to follow the Court's orders which has resulted in multiple stricken pleadings and time delays. (*See, e.g.*, Doc. 260).  Nevertheless, the sanction of

dismissal is extreme.  The Court has stricken many of Plaintiff's filings and specified the ones to which Defendants were to respond.  (Doc. 298).  Those are the appropriate and lesser sanctions here.  Defendants do not demonstrate sufficient prejudice to justify dismissal.  Further, a resolution on the merits is favored.  Because discovery is now closed and Plaintiff's First Amendment Retaliation Claim has survived summary judgment, the Court denies Defendants' Motion to Dismiss.

**IV.    Plaintiff's Motion for Leave to File Terminating Sanctions**

Plaintiff's motion, which the Court interprets as a motion to hold Defendants in default on all claims is dismissed as meritless.

**CONCLUSION**

The Court, as it indicated to Plaintiff it would, will submit Plaintiff's request for representation to the Court's pro bono representation program to determine if it can find an attorney willing to represent Plaintiff on his remaining claim at trial.  Should such an attorney be found, the parties will be notified, and Plaintiff can accept or decline such representation.  In any event, the Court will shortly set a status conference at which it will schedule the trial of this matter.

**IT IS THEREFORE ORDERED** that Defendant's Motion for Summary Judgment (Doc. 221) is **DENIED** in part as to Plaintiff's First Amendment Retaliation Claim.

**IT IS FUTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 221) is **GRANTED** in part as to Plaintiff's Wrongful Detention and *Monell* Claims.

**IT IS FUTHER ORDERED** that Defendant's Motion to Dismiss (Doc. 263) is **DENIED.**

**IT IS FUTHER ORDERED** that Plaintiff's Motion for Leave to File Terminating Sanctions (Doc. 290) is **DENIED**.

Dated this 8th day of April, 2026.

_G. Murray Snow_
G. Murray Snow
Senior United States District Judge